UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMIEL WILLIAMS, | |
| Petitioner, | Case No. 3:12-cv-00528 |
| v. | Judge Eli J. Richardson |
| | Magistrate Judge Alistair E. Newbern |
| CHANCE LEEDS,[1] | |
| Respondent. | |

To:    The Honorable Eli J. Richardson, District Judge

## REPORT AND RECOMMENDATION

On August 17, 2006, a Tennessee jury convicted Petitioner Jamiel Williams of one count of first-degree murder for the shooting death of Aaron Jones. (Doc. No. 30-2.) Williams was seventeen at the time of Jones's death, and the case was transferred from juvenile court to criminal court for Williams to be tried as an adult. (Doc. No. 32-3.) After his conviction, Williams was sentenced to a term of life imprisonment. (Doc. No. 30-2.)

Before the Court are Williams's pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 1), and an amended petition filed by Williams's court-appointed counsel (Doc.

---

[1]    The rules governing federal habeas petitions under 28 U.S.C. § 2254 provide that, "[i]f the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody." Habeas Corpus R. 2(a). Publicly available records from the Tennessee Department of Correction (TDOC) show that Williams is now incarcerated at the Whiteville Correctional Facility in Whiteville, Tennessee. *See* Felony Offender Information Search, https://foil.app.tn.gov/foil/search.jsp (follow "Search by TDOC ID" hyperlink, then search TDOC ID field for "00412350"). Warden Chance Leeds is the warden of that institution. *See* Whiteville Correctional Facility, https://www.tn.gov/correction/sp/state-prison-list/whiteville-correctional-facility.html (last visited July 7, 2022). He is therefore substituted as the proper respondent in this action.

No. 19). The State of Tennessee answered Williams's amended petition and filed the state-court record (Doc. Nos. 28, 30–30-6, 32–32-10), but did not answer Williams's pro se petition. After seeking to reopen his state post-conviction proceedings, Williams filed a response to the State's answer and supplemented the state-court record (Doc. Nos. 42–42-2). The State filed a reply and attached orders of the Tennessee Court of Criminal Appeals (TCCA) and Tennessee Supreme Court regarding Williams's application to reopen the state post-conviction proceedings (Doc. Nos. 45–45-2). At the Court's request (Doc. No. 48), both parties filed supplemental briefs (Doc. Nos. 50, 51). The State also filed a response to Williams's supplemental brief. (Doc. No. 52.)

For the reasons that follow, having considered the parties' arguments, the underlying record, and the stringent standards of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the Magistrate Judge will recommend that Williams's pro se and amended petitions be denied.

## I.      Background

### A.      Factual Background

The Tennessee Court of Criminal Appeals (TCCA) provided the following summary of the evidence presented at trial:

> John Paul Taylor, a detective with the Franklin Police Department, testified that on April 26, 2005, he was the on-call detective for the evening. Detective Taylor received a telephone call at 11:00 p.m. that someone had been shot on 9th Avenue and that the individual was being taken to the hospital. The individual was later identified as Aaron Jones. Detective Taylor went to the police station, picked up the "crime scene van," and went to the scene of the shooting. Several police officers were already on the scene and had closed the street. Shortly after arriving on the scene, Detective Taylor received a phone call informing him that the shooting victim had died. Detective Taylor testified that there were no witnesses at the scene.
>
> Detective Taylor testified he was able to ascertain where the shooting occurred by the "large pool of blood" behind 114 9th Avenue and "blood splatter" in the driveway leading to the rear of the house. Additionally, five shell casings were found at that location and sent to the Tennessee Bureau of Investigation (TBI) crime lab for analysis. No gun was recovered from the scene. Detective Taylor testified

that the blood trail gave the indication that after being shot the victim traveled about 25 to 30 feet to the back of the house before collapsing. He testified that the police retrieved samples of the blood from different areas, took photos, collected castings of footprints in the area near the shell casings, and interviewed neighbors.

Detective Taylor testified that the police received tips that led them to recover a gun at 1107 Incinerator Road, an address five to ten miles from the crime scene. Their information was that Tonya Thomas had acquired the gun. Ms. Thomas told police

> [T]he night of the shooting, she was at . . . Lottie Hardin's[2] [] home on Reddick Street when she heard a knock on the back door. And Cory Esmon showed up and he had the weapon with him. He then handed the weapon off to an individual by the name of Derrick McLemore . . . . [Derrick said to Cory] he didn't need to have that weapon . . . . Later that night Derrick was driving around with Tonya and . . . told her that she needed to hide the gun at her residence. He drove her to that location and she then exited the vehicle and hid the weapon in the back yard by a fence.

The recovered gun was photographed and sent to the TBI lab for analysis, where it was identified as a "High Point" .45 semi-automatic handgun. Detective Taylor testified that the TBI report showed that two bullets removed from victim's body were fired by this gun.

Detective Taylor testified that after interviewing many suspects the police apprehended the defendant at his grandmother's house within 48 hours of the shooting and that the defendant had "no demeanor; he basically just sat there" when taken into custody.

Detective Taylor attended the autopsy of the victim, noting that the victim sustained a gunshot wound to the face and two wounds to his chest.

Shavalia Radley testified that she was the victim's girlfriend and had been dating him for about one year. On April 26, 2005, Ms. Radley got off work at a Krystal restaurant at approximately 8:00 p.m., and she and the victim walked to her grandmother's house. They were planning to go to Reddick Court where their friend Demetria Jones lived. While on their way, they ran into a group of people including Jamal Pope, Cory Esmon, Paris "I don't know her last name," and the defendant. Ms. Radley testified that "Cory approached [the victim] and wanted to shake his hand, but [the victim] wouldn't shake his hand." This led to an argument with cursing and loud shouting, but no physical altercation occurred despite Mr. Esmon's grabbing a stick and the victim's having a knife.

---

[2]        Ms. Hardin is alternately referred to in the record as "Lottie Hardiman."

The shooting apparently occurred a short time later, when the victim returned to confront Mr. Esmon. Ricky Brice testified that he witnessed the shooting of the victim. He was outside and saw the victim engaged in a fight with Cory Esmon in front of Trent Covington's house while the defendant remained on Mr. Covington's porch. He testified that "[the victim] whooped Cory. In the process of [the victim's] whooping Cory, he had him down [on the ground] and he whooped him." He testified that Cory told the victim "yeah man, you won," and after the victim backed away, the defendant stepped off the porch and shot him. Mr. Brice testified that "the gun fired five times. And from the look of the strikes that the motions that [the victim] went through, I believe it hit him three times."

Trent Covington testified that he lived at 144 9th Avenue South and that on the evening of April 26, 2005, "[s]omebody got shot in my driveway." He testified that at the time of the fight, "[h]alf of us was on the porch, half was in the yard" and that "[f]rom my understanding it was over a female." He testified that the victim was winning the fight before it was stopped.

Doctor Feng Li, an assistant medical examiner for Davidson and Williamson counties, testified that an autopsy was performed on the victim's body on April 27, 2005. Doctor Li testified that the victim suffered one gunshot wound to the face, one to the left side of the chest, a third to the right side of the chest, and gunshot grazing wounds on his right upper arm and left wrist. There was no evidence of "stippling around the gunshot wounds, which indicated the shooter was more than two and one-half feet to three feet from the victim when he fired the shots. Doctor Li testified he was unable to determine the order of the gunshots or whether the shooter stood above the victim.

Corzell "Cory" Esmon testified that on April 26, 2005, he was hanging out with the defendant, Jamal Pope, and a man named Jarvis. They spent the day walking around town, driving around, and drinking alcohol. Mr. Esmon testified that he first met the victim on that day and that the afternoon altercation was the result of an argument started by the victim over his girlfriend. Mr. Esmon noticed the victim had his hands in his pants so he asked him why. He testified that the victim became defensive and said "something about I stab you—he said, You talking to my girl, I stab you." Mr. Esmon testified that he could not have been talking to the victim's girlfriend because he was there with another woman. He picked up a stick to defend himself from the victim, and the two of them were separated. Mr. Esmon and his group then left the scene and went to Trent Covington's house.

Mr. Esmon testified that at Mr. Covington's house he was told that the victim wanted to fight him one-on-one. He accepted the challenge and kept drinking until the victim arrived. When the victim arrived Mr. Esmon told him he was too drunk to fight him at that time. After continued provocation, Mr. Esmon took his shirt off, took a swing, missed, and fell down. Mr. Esmon testified that the victim then "fell on top of me and started pounding me in my face; just pound me, pound me." Mr. Esmon testified that he conceded defeat in the fight and that when he was getting up, the shooting occurred. He saw the defendant shoot the victim after the

defendant jumped off the porch. He testified he did not see the victim get hit, but he saw the shots fired and heard "[a]t least five—five to six shots." He did see the victim run behind the house after the shooting. Mr. Esmon testified he retrieved the gun from the defendant and ran away with the intent to dispose of the weapon. He went to Lottie Hardin's home, where he smoked crack cocaine and gave the gun to Derrick McLemore.

On cross examination, Mr. Esmon admitted to removing the magazine from the gun but denied removing any bullets. He testified that no bullets remained in the gun.

Antonio Brown testified that he was a member of the "Bloods" gang and was currently incarcerated for a parole violation from a drug charge. On the afternoon of the shooting, Mr. Brown was driving around the city and happened to drive by Mr. Esmon and the victim during their first altercation of the day. He knew the victim's girlfriend, Ms. Radley, because he knew her family. He testified that he asked Ms. Radley what was going on, and the victim responded that Mr. Esmon's group was trying to jump him. Mr. Brown got out of his car to talk to the people still at the scene. The victim departed, and Mr. Esmon told Mr. Brown that the victim pulled a knife on him. He testified that the defendant then stated, "I'm going to get my folks—you know what I'm saying, we ain't got time to be talking about that. I'm going to get my folks and we're going to have this out."

Mr. Brown testified that he got back in his car and drove down the street, found the victim and Ms. Radley, and asked them about the incident. The victim reported that "Cory supposedly disrespected him or something . . . . Cory said a smart remark to him; something like they're going to make me kill him, or something to that nature, you know."

Mr. Brown testified that later that day he saw the victim walking to Trent Covington's. He picked the victim up and drove him there with the intention of straightening things out. He testified, "You had Cory's story, then you had [the victim's] story, so we were just trying to . . . let both of them talk [to] . . . find out who be telling the truth, who would be lying." Mr. Brown determined that Cory was lying and "that he had been knowing this girl, or something, longer than him." He testified that everyone agreed that Mr. Esmon and the victim would fight. Mr. Esmon had a gun and he gave it to the defendant before the fight began. They started the fight, and the victim started "whooping" Mr. Esmon. He testified that after Mr. Esmon admitted defeat, "[the victim] was getting ready to get up . . . [and the defendant] jumped off the porch, man, and just started shooting."

The defendant chose not to testify.

*State v. Williams*, No. M2007-01666-CCA-R3-CD, 2008 WL 2200008, at *1–4 (Tenn. Crim. App.

May 27, 2008), *perm. app. denied* (Tenn. Dec. 8, 2008) (all alterations in original).

## B. Procedural Background

### 1. Trial, Conviction, and Direct Appeal

After a hearing in the Juvenile Court of Williamson County, Tennessee, Williams's case was transferred to Williamson County Circuit Criminal Court for Williams to be tried as an adult. (Doc. No. 32-1.) The Williamson County grand jury indicted Williams on August 8, 2005, on one count of first-degree premeditated murder. *State v. Williams*, 2008 WL 2200008, at *1; Tenn. Code Ann. § 39-13-202 (2003). On August 17, 2006, a jury convicted Williams of first-degree murder, and. on October 24, 2006, the trial court sentenced him to life in prison. *State v. Williams*, 2008 WL 2200008, at *1. Attorney Robert H. Hassell, III, represented Williams at the juvenile transfer hearing and at trial. (Doc. Nos. 32-1, 32-2.)

Williams filed a direct appeal of his conviction, arguing that there was insufficient evidence to support a finding of premeditation. *State v. Williams*, 2008 WL 2200008, at *1. The TCCA rejected that argument and affirmed Williams's conviction.[3] *Id.* at *5. In affirming Williams's conviction, the TCCA held as follows:

> [I]t is our view that the evidence was sufficient to support the conviction of premeditated first degree murder. After the confrontation between the victim and Mr. Esmon, the defendant made the statement, "I'm going to get my folks; we're going to have this out." A jury may infer premeditation from a defendant's prior threats. *See State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003). The defendant procured the gun from another individual, Mr. Esmon. He used that gun to shoot the victim multiple times. *See State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000) (holding that infliction of multiple wounds on a victim may be indicative of premeditation). The defendant fled the scene and left the gun with Mr. Esmon, who later concealed the evidence. There was ample evidence to support the conviction for premeditated first degree murder.

---

[3] The TCCA found that the trial court had incorrectly classified Williams's offense as a Class A felony and remanded the case to the trial court with an order to amend the judgment to reflect that first-degree murder occupies a separate conviction class. *State v. Williams*, 2008 WL 2200008, at *5.

*Id.* The Tennessee Supreme Court denied Williams's application for permission to appeal the TCCA's decision. *Id.*

### 2.    State Post-Conviction Proceedings

On November 20, 2009, Williams filed a pro se petition for post-conviction relief in the Williamson County Circuit Court (the post-conviction trial court), alleging ineffective assistance of trial counsel. *See Williams v. State*, No. M2011-01316-CCA-R3PC, 2012 WL 1941780, at *1 (Tenn. Crim. App. May 30, 2012), *perm. app. denied* (Tenn. Oct. 17, 2012). That court appointed post-conviction counsel and Williams filed an amended petition on October 27, 2010, arguing that trial counsel provided ineffective representation and prejudiced Williams's case by failing to: (1) file motions in limine to exclude evidence of Williams's alleged gang affiliation under Tennessee Rule of Evidence 404(b); (2) object to the introduction of an out-of-court statement by Covington; (3) request a jury instruction regarding Esmon's testimony based on Esmon's role as an accessory after the fact; (4) adequately investigate or call witnesses at trial; (5) properly investigate the crime scene; (6) adequately instruct Williams about a plea offer and the consequences associated with a potential conviction for first-degree murder; (7) explain the elements of first-degree murder and argue the facts against premeditation to the jury; and (8) call essential witnesses, inform Williams of his right to testify on his own behalf, or object to the introduction of physical evidence at the juvenile transfer hearing. (Doc. No. 30-2.)

The post-conviction trial court held an evidentiary hearing on Williams's amended petition, and the TCCA provided the following description of the evidence presented at that hearing:

> At the evidentiary hearing, the petitioner testified that trial counsel, who was retained by his family, visited him about six times while he was in juvenile detention and another three times after he had been transferred to circuit court. He said that counsel explained what a juvenile transfer hearing was but never told him that he had the right to testify and call witnesses at the hearing. The petitioner stated that he would have chosen to testify on his own behalf at the hearing had he been given a chance to do so.

7

The petitioner testified that he maintained from the beginning that he was not guilty and provided counsel with the names of several eyewitnesses, including Marquis Grayson, who could have testified that he was not the person who shot the victim. Counsel, however, told him that his witnesses' status as gang members would only hurt his case. Counsel also talked him out of testifying in his own defense by telling him that he would not be able to withstand cross-examination. The petitioner complained that counsel's failure to call his witnesses or to let him testify resulted in his conviction for first degree murder despite the fact that he was innocent of the crime. The petitioner claimed that he "followed [counsel's] influence" and therefore had not understood what he was doing when he assured the trial court that he understood his rights and that it was his decision not to testify.

The petitioner acknowledged that an "Affidavit of Jamiel Williams," which was admitted as an exhibit at the evidentiary hearing, contained his signature. He claimed, however, that he had no memory of signing it, did not understand what it contained, and must have signed solely because counsel told him to do so. The affidavit stated, among other things, that the petitioner had met with counsel "for many hours"; that he and counsel had "thoroughly discussed" the evidence against him, the charge he faced, and his defense theory; that he understood that he would spend the rest of his life in prison if convicted of the offense; that the petitioner maintained he did not kill the victim and wished to proceed with an identity defense, despite counsel's having informed him that the facts suggested that a defense of self-defense or at least a mitigation of the culpable mental state might be available to him; and that the petitioner was pleased with counsel's representation. The affidavit also stated that the petitioner had rejected a plea deal of fifteen years for second degree murder.

Trial counsel, who was licensed to practice law in 1998, testified that he had participated in several first degree murder trials and handled several juvenile transfer hearings by the time he took the petitioner's case. He said he took great care in explaining things to the petitioner, including the transfer proceedings, his right to testify at the transfer hearing, and the consequences of his transfer to circuit court. Counsel stated that he essentially treated the transfer hearing as a preliminary hearing because he believed, based on his experience and the facts of the case, that the probability of transfer was very high. He said that the petitioner's "manner and affect" were not always appropriate, but he saw no reason to request an independent mental evaluation because the petitioner had been found competent in an evaluation performed as part of his "JCCO," and neither the petitioner's brother nor mother ever indicated that the petitioner was unable to understand the proceedings or help in his own defense.

Trial counsel testified that the petitioner's brother was very helpful in his investigation and preparation of the case, arranging for the petitioner's potential witnesses, including Marquis Grayson and Lorez Murray, or "Gizmo," to meet with counsel. However, although Grayson volunteered to "say whatever [counsel] want[ed] [him] to say" in the petitioner's defense, each of the potential witnesses told counsel that he had not seen the actual shooting and did not know who was

responsible for the victim's death. Counsel, therefore, saw no point in calling them as witnesses. Counsel stated that he called Jarvis Brown as a witness at the transfer hearing but that he evaded every question and was a "disaster," so he did not call him at trial.

Counsel testified that he saw no need to hire an investigator because all the witnesses were readily accessible to him, either through personal interviews arranged by the petitioner's brother or through the statements they had given to the police. He also saw no reason to file a motion in limine to exclude gang references. Part of his defense strategy was to attempt to discredit one of the State's eyewitnesses by showing his membership in a gang. Furthermore, he did not remember the petitioner's ever having been identified at trial as a gang member. Counsel said he did not think the typical lay juror, unfamiliar with the criminal justice system, would automatically associate the petitioner's comment about "his folks" with membership in a gang. As for the admission of Trent Covington's statement to police, counsel testified that although he initially objected to it and perhaps, in hindsight, should have fought harder to keep the actual statement out of evidence, he did not want to "make a bigger deal out of it than it was" because Covington testified at trial that the statement was inaccurate and the trial court issued a limiting instruction to the jury regarding its use.

Trial counsel testified that their defense theory was that Cory Esmon, and not the petitioner, shot the victim. To that end, he not only vigorously cross-examined Esmon, but also called as a witness Tonya Thomas, who testified that Esmon, covered in blood and carrying the murder weapon, came running into the house after the shooting saying that he had to "pull the bullet" because it had his fingerprints on it. Counsel said that the petitioner maintained from the beginning that he was not the shooter but, for over a year prior to trial, insisted that he did not know who the actual shooter was. The petitioner changed his story shortly before trial, saying that he had seen Esmon shoot the victim. Because the petitioner had never before identified Esmon as the shooter, including during hours of police interrogation, counsel advised him that the prosecutor would be "a formidable opponent" to him if he took the stand in his own defense to testify that Esmon was the shooter. Counsel said that both he and the trial court took great care during the colloquy to ensure that the petitioner understood his rights with respect to testifying and that it was his own decision not to take the stand.

Trial counsel testified that he did not think it was a first degree murder case and believed that there was evidence to mitigate against its being a premeditated killing but that the petitioner was adamant that he did not want him to pursue that argument, despite counsel's best advice to the contrary. Counsel explained the post-conviction process to the petitioner, read the affidavit to him, and advised him to think about it and sign it if he wished to do so. According to counsel, the petitioner protested that he would never file an ineffective assistance of counsel claim against him and willingly signed the affidavit.

The petitioner's older brother, twenty-six-year-old Phillip Williams, testified that he offered his assistance to counsel and brought witnesses to him to be interviewed. Counsel did not, however, ever ask him to go into the community to knock on doors in an attempt to locate other witnesses, and counsel never discussed hiring a private investigator to help with the case.

Marquis Grayson testified that he told trial counsel that he saw Cory Esmon shoot the victim. He said he expected to be called as a witness at trial, but counsel told him his testimony was unnecessary. Grayson adamantly denied having ever told counsel that he did not witness the shooting and claimed that counsel must have gotten him confused with someone else.

Trial counsel, recalled as a witness for the State, reiterated that Grayson never told him that he had seen Esmon shoot the victim but instead offered to say whatever counsel wanted him to say in the petitioner's defense.

*Williams v. State*, 2012 WL 1941780, at *1–4. The post-conviction trial court credited Hassell's testimony over that of Williams, found Grayson's testimony not to be credible, and denied Williams's amended petition, finding that Williams had not shown by clear and convincing evidence that he had received ineffective assistance of counsel and had failed to show any resulting prejudice. *Id.* at *4.

The TCCA affirmed the post-conviction trial court's order, explaining its reasoning as follows:

> The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40–30–110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

*     *     *

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The petitioner argues that trial counsel was deficient for not filing a motion in limine to exclude any reference to his possible gang affiliation, for failing to object to the introduction of Trent Covington's statement, for failing to adequately investigate the case, for failing to instruct the petitioner of the consequences of a first degree murder conviction, for failing to argue against premeditation to the jury, and for failing to call essential witnesses.

The record, however, fully supports the findings and conclusions of the post-conviction court that the petitioner failed to show that he received ineffective assistance of counsel. As the post-conviction court noted, many of counsel's decisions, such as whether to call certain witnesses or to object to the introduction of evidence, were matters of sound trial strategy that were based on counsel's experience and preparation for the case. *See Strickland*, 466 U.S. at 689; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In addition, counsel's testimony, which was specifically accredited by the post-conviction court, established that counsel met with the petitioner on a number of occasions, took great care to explain to the petitioner the court proceedings, the evidence against him, his rights to testify, the consequences of a murder conviction, and the possible defense theories he believed they might advance. Trial counsel's testimony, as well as the affidavit, further establishes that counsel ultimately proceeded with the identity defense that the

petitioner maintained from the beginning and which he instructed counsel to pursue. We conclude, therefore, that the petitioner has not shown that counsel was deficient in his representation or that he suffered any deficiency as a result.

*Id.* at *4–5. The Tennessee Supreme Court denied Williams's application for permission to appeal on October 17, 2012. *Id.*

### 3. Federal Petition for Writ of Habeas Corpus

Williams, acting pro se, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 and supporting memorandum of law in this Court, asserting claims that his trial counsel was ineffective and that there was insufficient evidence to support his conviction. (Doc. Nos. 1, 2.) The Court appointed counsel for Williams and ordered the State "to file a response to [Williams's pro se] petition within ninety (90) days" of the Court's "[o]rder or within thirty (30) days of the filing of an amended petition, whichever occurs first." (Doc. No. 8, PageID# 33.) Before ninety days had passed, the Court granted Williams's motion to stay this action and hold Williams's petition in abeyance until he had exhausted his state-court post-conviction remedies. (Doc. No. 17.)

After the Tennessee Supreme Court denied Williams's application for review of the post-conviction proceedings, *see Williams v. State*, 2012 WL 1941780, Williams, acting through counsel, moved to reopen this case (Doc. No. 18) and filed an amended petition (Doc. No. 19). The amended petition includes the following claims: (1) Williams's sentence is prohibited under *Miller v. Alabama*, 567 U.S. 460 (2012), which declared mandatory sentences of life without parole for juvenile offenders unconstitutional; (2) Williams's trial counsel was ineffective; (3) Williams was deprived of his right under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to have a jury decide whether to transfer Williams from juvenile to criminal court; and (4) because Williams is factually innocent, his conviction and continued incarceration violate his due process rights under the Fifth and Fourteenth Amendments. (*Id.*) Williams asserts that his amended petition

"supplements" and "does not abrogate any of the claims" raised in his pro se petition.[4] (*Id.* at PageID# 51, ¶ 21.)

The Court granted Williams's motion to reopen this case (Doc. No. 21) and, in accordance with the Court's orders (*id.*; Doc. No. 8), the State answered Williams's amended petition (Doc. No. 28) and filed the state-court record (Doc. Nos. 30–30-6, 32–32-10). In its answer, the State argues that, because Williams's amended petition does not address whether Williams has exhausted state remedies for each of his asserted claims, the Court should dismiss the petition without prejudice to refiling a petition including that information. (Doc. No. 28.) The State also argues that Williams has not exhausted most of the claims in the amended petition and that those claims are now procedurally defaulted. (*Id.*) To the extent that Williams's amended petition raises ineffective assistance of counsel claims that were exhausted on post-conviction appeal, the State argues that Williams is not entitled to relief for any of those claims because he has not satisfied the requirements of 28 U.S.C. § 2254(d). (*Id.*) The State has not addressed the claims raised in Williams's pro se petition.

In 2013, the Court stayed these proceedings again while Williams sought to reopen his state post-conviction petition to exhaust his *Miller* claim. (Doc. No. 34.) In 2018, Williams moved to reopen the case (Doc. No. 40) and filed a response to the State's answer, attaching copies of his motion to reopen the state post-conviction proceedings and the post-conviction trial court's order denying that motion (Doc. Nos. 42–42-2.) In his response, Williams argues that his *Miller* claim

---

[4]    The general rule that "amended pleadings supersede original pleadings . . . applies to habeas petitions." *Braden v. United States*, 817 F.3d 926, 930 (6th Cir. 2016). However, the Sixth Circuit has "recognized exceptions to this rule where a party evinces an intent for the amended pleading to supplement rather than supersede the original pleading[.]" *Id.* (citing *Clark v. Johnston*, 413 F. App'x 804, 811–12 (6th Cir. 2011)). Because Williams's amended petition specifically states that it was intended to supplement, not supersede, the original petition (Doc. No. 19), the Court considers the claims raised in both the pro se petition and the petition filed by counsel.

has been exhausted and should be granted on its merits, but states that, "[h]aving reviewed the record and pleadings, [he] does not intend to further explain his other claims." (Doc. No. 42, PageID# 1662.)

The Court granted Williams's motion to reopen the case and permitted the State to file a reply in support of its answer. (Doc. No. 44.) The State filed a reply arguing that Williams's *Miller* claim is procedurally defaulted and attached orders of the TCCA and the Tennessee Supreme Court denying Williams permission to appeal the trial court's denial of his motion to reopen post-conviction proceedings (Doc. Nos. 45–45-2).

This case was stayed again in 2019 while *Malvo v. Mathena*, 893 F.3d 265 (4th Cir. 2018), *cert. granted*, 139 S. Ct. 1317 (2019) (No. 18-217), which had the potential to affect the determination of Williams's *Miller* claim, was pending before the Supreme Court of the United States. (Doc. No. 47.) After *Malvo* was voluntarily dismissed, *Mathena v. Malvo*, 140 S. Ct. 919 (2020), the Court reopened this case and ordered the parties to file supplemental briefs addressing the Sixth Circuit's interim holding in *Atkins v. Crowell*, 945 F.3d 476 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2786 (2020). (Doc. No. 48.) The parties filed supplemental briefs (Doc. Nos. 50, 51), and the State filed a response to Williams's supplemental brief (Doc. No. 52). This matter is now ripe for the Court's review.

## II.     Legal Standard

Williams's habeas petition is governed by 28 U.S.C. § 2254(d), as amended by AEDPA. The statute provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

Under § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law only "if the state court applies a rule different from the governing law set forth in" the Supreme Court's holdings "or if it decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor* (*Williams*), 529 U.S. 362, 405–06 (2000)). A state court's "decision is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case[.]" *White v. Woodall*, 572 U.S. 415, 426 (2014). Notably, to be actionable under § 2254(d)(1), a state court's unreasonable application of Supreme Court precedent "'"must be objectively unreasonable, not merely wrong; even clear error will not suffice."'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). Instead, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), habeas relief is available if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, the statute provides that a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006))).

AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)). The Supreme Court has held that the AEDPA standard is difficult to meet "because it was meant to be." *Harrington*, 562 U.S. at 102; *see also Burt*, 571 U.S. at 20; *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle "that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)); *see also Woods*, 575 U.S. at 316.

AEDPA also imposes a "total exhaustion requirement," providing that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" with respect to each claim, or such

remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (second and third alteration in original) (quoting 28 U.S.C. § 2254(b)(1)(A)); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."). This "exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). AEDPA therefore requires a petitioner to "properly present[] his or her claims through one 'complete round of the State's established appellate review process.'" *Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (quoting *id.* at 845). A petitioner incarcerated in Tennessee exhausts all available state remedies under AEDPA once the TCCA denies a claim of error. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39 (exhaustion of remedies)).

"Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). Under the doctrine of procedural default, a petitioner who may no longer present claims in state court because he or she failed to meet state procedural requirements must "demonstrate cause for his [or her] state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). The one exception to this doctrine "is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that [the federal habeas court's] failure to review his [or her] federal claim will result in a fundamental miscarriage of justice." *Id.*

## III.    Analysis

Williams's amended petition includes claims that: (1) Williams's sentence is prohibited under *Miller v. Alabama* (Claim One); (2) Williams's trial counsel was ineffective (Claim Two); (3) the transfer of Williams's case from juvenile to criminal court violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (Claim Three); and (4) Williams's conviction and continued incarceration violates his due process rights because Williams is factually innocent (Claim Four). (Doc. No. 19.) Williams's pro se petition includes claims that the evidence presented at trial was insufficient to support Williams's conviction (Claim Five) and additional allegations that trial counsel was ineffective (Claim Two). (Doc. Nos. 1, 2.) Specifically, Williams alleges in the pro se and amended petitions that trial counsel was ineffective because he:

(2)(a)    Failed to properly investigate the crime scene;

(2)(b)    Failed to adequately investigate or call essential witnesses, including Marquis Grayson;

(2)(c)    Failed to have Williams evaluated during the juvenile transfer proceedings to determine the appropriateness of his transfer to adult court and to ensure that Williams could understand what was happening in his case;

(2)(d)    Failed to inform Williams of his right to testify at the juvenile transfer hearing and that such testimony would not be used against him in further criminal court proceedings;

(2)(e)    Failed to explain the elements of first-degree murder and argue the facts against premeditation to the jury;

(2)(f)    Failed to call essential witnesses at the juvenile transfer hearing;

(2)(g)    Failed to object to the prosecution's closing argument during trial;

(2)(h)    Failed to object to the introduction of crime scene photographs and shoe imprints and to testimony regarding that evidence;

(2)(i)    Failed to file a motion in limine to exclude evidence of Williams's alleged gang affiliation under Tennessee Rule of Evidence 404(b);

(2)(j)    Failed to call an expert witness;

(2)(k)  Failed to adequately investigate and present evidence of other suspects, including Esmon;

(2)(l)  Failed to effectively cross-examine the prosecution's witnesses;

(2)(m)  Failed to object on hearsay grounds to the admission of evidence regarding Esmon's actions after the shooting;

(2)(n)  Failed to object to speculative testimony about gunshot residue;

(2)(o)  Failed to object to victim impact testimony by Jones's mother, Jane Kelton Jones Eaton;

(2)(p)  Failed to object to the introduction of autopsy photographs;

(2)(q)  Failed to object on hearsay and/or confrontation clause grounds to testimony and exhibits regarding forensic analysis about which the actual examiner never testified;

(2)(r)  Failed to object on hearsay grounds to testimony that Williams committed the murder;

(2)(s)  Failed to object on hearsay grounds to the admission of Covington's prior inconsistent statement into evidence; and

(2)(t)  Failed to timely and thoroughly convey all plea offers, explain the consequences of accepting or rejecting the offer, and advise Williams whether to accept the offer.

(Doc. Nos. 1, 2, 19.)

The pro se and amended petitions contain both procedurally defaulted and properly exhausted claims. The Court will consider these claims separately under the relevant standards.

## A.  Williams's Procedurally Defaulted Claims

The State argues that many of the claims raised in Williams's amended petition have not been exhausted because Williams has never presented them to the TCCA, is now barred from doing so, and has not shown the required cause and prejudice for this Court to consider those claims on the merits. (Doc. No. 28.) The State has not addressed whether the claims raised in Williams's pro se petition have been exhausted. While the exhaustion requirement can be waived, AEDPA provides that "[a] state shall not be deemed to have waived the exhaustion requirement

or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). The State did not expressly waive its non-exhaustion defense regarding the claims in Williams's pro se petition, and argued that any claims that Williams did not "fully and fairly present[ ] to the TCCA" are procedurally defaulted. (Doc. No. 28, PageID# 81.) Williams responded that he did "not intend to further explain" any of his non-*Miller* claims. (Doc. No. 42, PageID# 1662.) The parties' positions weigh in favor of the Court considering whether those claims have been exhausted and are procedurally defaulted. *See Eakes v. Sexton*, 592 F. App'x 422, 430 (6th Cir. 2014) (considering lack of exhaustion sua sponte where the State did not expressly waive exhaustion but failed to raise the matter on appeal); *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005) (holding that district court may consider procedural default sua sponte where petitioner has opportunity to respond). Because Williams did not address the issue after being placed on notice that any claims not presented to the TCCA were subject to procedural default, the Court will consider whether Williams has exhausted the claims in his pro se and amended petitions and whether those claims are procedurally defaulted.

The State argues that Williams's *Apprendi* and factual innocence claims (Claims Three and Four) are procedurally defaulted. (Doc. No. 28.) Williams has not responded to the State's arguments on this point, and the record shows that Williams's direct appeal and post-conviction appellate briefs to the TCCA (Doc. Nos. 30-1, 30-6) do not mention Williams's *Apprendi* or factual innocence claims.[5] Williams has therefore failed to exhaust his state remedies with respect

---

[5] Even if Williams had properly exhausted his factual innocence claim, the claim would not be cognizable under binding Sixth Circuit and Supreme Court precedent. Like Williams, the petitioner in *Cress v. Palmer* argued "that, given 'overwhelming' proof of his innocence, his continued incarceration violates his due process rights, an argument that has been characterized as a free-standing innocence claim when not coupled with allegations of constitutional error at trial." 484 F.3d 844, 854 (6th Cir. 2007). The Sixth Circuit held that such a claim is "not cognizable on habeas" review. *Id.*; *see also Herrera v. Collins*, 506 U.S. 390, 400 (1993) (holding that actual

to these claims. *See Adams*, 330 F.3d at 402 (holding that, in Tennessee, exhaustion requires a claim to have been fairly presented to the TCCA).

The State also argues that Williams has not exhausted most of the ineffective assistance of counsel claims raised in Williams's amended petition, except for Claim (2)(b), "to the extent that [Williams] asserts trial counsel should have interviewed Marquis Grayson and other gang members;" Claim (2)(t), "to the extent that [Williams] asserts trial counsel was ineffective for failing to explain [his] sentencing exposure for first degree murder[;]" and Claim (2)(e), "to the extent that [Williams] asserts trial counsel should have argued the State's failure to prove premeditation." (*Id.* at PageID# 83.) The record shows that Williams presented some of the ineffective assistance of counsel claims raised in his pro se and amended petitions to the TCCA,

---

innocence claims involving newly discovered evidence are not a basis "for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding").

Nor does Williams invoke the miscarriage of justice exception, by which a habeas petitioner "whose claim may otherwise be barred by various federal or state procedural rules 'may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence.'" *Penney v. United States*, 870 F.3d 459, 462 (6th Cir. 2017) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)). Actual innocence may serve as a gateway to consideration of a petitioner's procedurally defaulted claims if the petitioner shows "'that, in light of . . . new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

Williams argues generally that "[t]here is overwhelming evidence" that Williams is innocent, that "[s]ubstantial evidence" implicates Esmon, and that "substantial evidence" undermines the credibility of "the witnesses who identified Williams, rather than Esmon, as the shooter" (Doc. No. 19, PageID# 59, ¶ 58), but he has not put forth any new evidence based on which "'no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329). Accordingly, his actual innocence claim cannot serve as a gateway for consideration of his procedurally defaulted claims.

To the extent that these arguments can be construed as challenging the sufficiency of the evidence underlying Williams's conviction, that claim, like the sufficiency of the evidence claim raised in Williams's pro se petition, has not been exhausted and is now procedurally defaulted.

21

but did not present Claims (2)(c), (2)(g), and (2)(j)–(2)(r) and therefore has not exhausted those claims. (Doc. Nos. 30-1, 30-6); *see Caver v. Straub*, 349 F.3d 340, 346–47 (6th Cir. 2003) ("[T]o the extent that an ineffective assistance of counsel claim is based upon a different allegedly ineffective action than the claim presented to the state courts, the claim has not been fairly presented to the state courts.").

Williams also has not exhausted the claim in his pro se petition that the evidence presented at trial was insufficient to support his conviction because "evidence . . . would have called into question the credibility given to various witnesses" who testified against Williams (Claim Five). (Doc. No. 2, PageID# 22.) Although Williams raised a sufficiency of the evidence claim on direct appeal, he challenged only the sufficiency of the evidence of premeditation and specifically noted that he did "not assert that the evidence presented at trial was legally insufficient to find that he was guilty of killing Aaron Jones[.]" (Doc. No 30-1, PageID# 101.) "[T]he doctrine of exhaustion requires that the same claim *under the same theory* be presented to the state courts before raising it in a federal habeas petition." *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)). Because the sufficiency of the evidence claim in Williams's pro se petition is based on a different theory than was presented to the TCCA, that claim has not been exhausted.

The State correctly notes that the statute of limitations for filing post-conviction actions in Tennessee is one year and that petitioners may not file multiple petitions attacking a single judgment. *See* Tenn. Code Ann. § 40-30-102(a), (c). The Court therefore finds that Williams's non-exhausted claims are procedurally defaulted and that Williams "has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732; *see also West v. Carpenter*, 790 F.3d 693, 697 (6th Cir. 2015) ("If the petition[er] fails to raise a claim on

appeal, in violation of a state procedural rule, that claim is subject to procedural default and will not be reviewed by federal courts unless the petitioner demonstrates cause and prejudice for his default."); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (holding that petitioner procedurally defaulted an "ineffective assistance claim rest[ing] on a theory which [was] separate and distinct from the one previously considered and rejected in state court").

The State also argues that Williams's *Miller* claim (Claim One) is procedurally defaulted under the independent and adequate state ground doctrine. (Doc. No. 45.) That doctrine provides that federal courts may not review a petitioner's claims that "a state court declined to address . . . because the [petitioner] had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 730. After the post-conviction trial court denied Williams's petition to reopen the post-conviction proceedings to assert his *Miller* claim, Williams sought permission to appeal from the TCCA under Tenn. Code Ann. § 40-30-117(c). (Doc. No. 45-1.) The TCCA denied permission to appeal because Williams "did not attach to his application copies of any of the documents filed in the trial court[,]" leaving the TCCA "unable to conduct an adequate review of the application." (*Id.*); *see also* Tenn. Code Ann. § 40-30-117(c) (requiring that an application to appeal the denial of a motion to reopen "shall be accompanied by copies of all the documents filed by both parties in the trial court and the order denying the motion"). Because the TCCA's denial was based solely on procedural grounds, and because those procedural grounds are independent of Williams's *Miller* claim and adequate to support the judgment, that claim is procedurally defaulted. *See Coleman*, 501 U.S. at 729–32.

Williams has not argued that there is cause for his procedural default or resulting prejudice as required for this Court to reach the merits of procedurally defaulted claims. *See Edwards*, 529 U.S. at 451. Nor has Williams shown that failure to review these claims "will result in a

fundamental miscarriage of justice." *Id.* The Court therefore finds that AEDPA bars relief on Claims One, Three, Four, and Five, and Subclaims (2)(c), (2)(g), and (2)(j)–(2)(r). *See id.*; *Coleman*, 501 U.S. at 729–32.

### B. Williams's Remaining Claims

All of Williams's remaining claims concern the right to effective assistance of trial counsel. Williams argues that trial counsel was ineffective because he failed to properly investigate the crime scene; interview and call essential witnesses; inform Williams of his right to testify at the juvenile transfer hearing; adequately explain the elements of first-degree murder and argue the facts against premeditation to the jury; object to the introduction of physical evidence and testimony regarding that evidence; file a motion in limine to exclude evidence of Williams's alleged gang affiliation; object to the introduction of Covington's prior inconsistent statement; and adequately convey and explain all plea offers to Williams. (Doc. Nos. 1, 2, 19.)

Under AEDPA, the question for this Court is whether the TCCA's adjudication of Williams's ineffective-assistance-of-counsel claims resulted in a decision that was contrary to or involved an unreasonable application of federal law as determined by Supreme Court precedent, 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in state court, *id.* § 2254(d)(2). The standard applied to Williams's non-defaulted ineffective-assistance-of-counsel claims is "a '"doubly deferential"' standard of review that gives both the state court and the defense attorney[s] the benefit of the doubt." *Burt*, 571 U.S. at 15 (quoting *Cullen*, 563 U.S. at 190). This standard provides for the usual AEDPA deference to the state court's decision, while the deference to counsel derives from the Supreme Court's opinion in *Strickland v. Washington*, which establishes "a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance[.]" 466 U.S. at 689.[6] To overcome this presumption, petitioners "must show that counsel failed to act 'reasonabl[y] considering all the circumstances'" and "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Cullen*, 563 U.S. at 189 (alteration in original) (quoting *Strickland*, 466 U.S. at 688, 694). Viewed through AEDPA's "'deferential lens[,]'" *id.* at 190 (citation omitted), the question becomes "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" *Harrington*, 562 U.S. at 105.

Here, in analyzing the ineffective-assistance-of-counsel claims that Williams presented in his post-conviction appeal, the TCCA discussed *Strickland*'s deferential standard and found that:

> The record . . . fully supports the findings and conclusions of the post-conviction court that the petitioner failed to show that he received ineffective assistance of counsel. As the post-conviction court noted, many of counsel's decisions, such as whether to call certain witnesses or to object to the introduction of evidence, were matters of sound trial strategy that were based on counsel's experience and preparation for the case. *See Strickland*, 466 U.S. at 689; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In addition, counsel's testimony, which was specifically accredited by the post-conviction court, established that counsel met with the petitioner on a number of occasions, took great care to explain to the petitioner the court proceedings, the evidence against him, his rights to testify, the consequences of a murder conviction, and the possible defense theories he believed they might advance. Trial counsel's testimony, as well as the affidavit, further establishes that counsel ultimately proceeded with the identity defense that the petitioner maintained from the beginning and which he instructed counsel to pursue.

*State v. Williams*, 2012 WL 1941780, at *5. The TCCA concluded that Williams "ha[d] not shown that counsel was deficient in his representation or that he suffered any deficiency as a result" and affirmed the findings of the post-conviction trial court. *Id.*

---

[6]     *Strickland* also governs a petitioner's claim that counsel failed to adequately communicate and explain plea offers. *See Johnson v. Genovese*, 924 F.3d 929, 934 (6th Cir. 2019) ("A defendant who rejects or otherwise misses out on a formal plea offer because of deficient performance or erroneous advice can establish ineffective assistance of counsel only if he satisfies the well-known *Strickland* standard." (citing *Lafler v. Cooper*, 566 U.S. 156, 172–74 (2012))).

Williams argues generally that the TCCA applied *Strickland* "erroneously" to his petition (Doc. No. 2, PageID# 13), but declines "to further explain" his ineffective assistance of counsel claims. (Doc. No. 42, PageID# 1662.) Williams has not argued that the TCCA "applie[d] a rule different from the governing law set forth in" the Supreme Court's holdings or "decide[d] [his] case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Bell*, 535 U.S. at 694. Nor has he rebutted the state court's factual determinations by clear and convincing evidence. *Davis*, 576 U.S. at 271. The Court cannot conclude that the TCCA's decision was based on an unreasonable application of law or determination of the facts, as AEDPA requires. *See* 28 U.S.C. § 2254(d)(1)–(2). Presuming that the TCCA's factual findings are correct, as it must, the Court finds that there are reasonable arguments that Williams's trial counsel satisfied the minimum standards for representation set forth in *Strickland*. *See Harrington*, 562 U.S. at 105. Williams therefore has not shown that he is entitled to relief under AEDPA for any of his non-defaulted ineffective-assistance-of-counsel claims.

**IV.     Recommendation**

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Williams's pro se and amended petitions (Doc. Nos. 1, 19) be DENIED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 22nd day of August, 2022.

ALISTAIR E. NEWBERN
United States Magistrate Judge